ARCHER–DANIELS–MIDLAND COMPANY, Reidy Terminal, Inc., ADM/Growmark River System, Inc., American River Transportation Co., ADM Milling Co., Collingwood Grain, Inc., Tabor Grain Co., Plaintiffs,

v.

PHOENIX ASSURANCE COMPANY OF NEW YORK, Commonwealth Insurance Company, Navigators Insurance Company, Albany Insurance Company, Hartford Fire Insurance Company, Defendants.

No. 95–CV–4001–JLF.

United States District Court,
S.D. Illinois.

July 17, 1996.

A. James Shafter, Deanne F. Jones, Kehart, Shafter, Hughes & Webber, P.C., Decatur, IL, James E. Peckert, Decatur, IL, Aubrey M. Daniel, III, James W. Shannon, Jr., J. Alan Galbraith, and J. Gordon Seymour, Williams & Connolly, Washington, DC, for plaintiffs.

Carl L. Favreau, Campbell, Black, Carmine & Hedin, Mt. Vernon, IL, Maynerd I. Steinberg, Lord, Bissell & Brook, Chicago, IL, Eric C. Young, Dunham, Boman & Leskera, East St. Louis, IL, Harry P. Cohen, Richard M. Appel, Franklin F. Bass, Andrew L. Klauber, Michael Verde, Steven E. Goldman, Rosenman & Colin, New York City, Donald V. Ferrell, Jelliffe, Ferrell & Morris, Harrisburg, IL and Charles M. Fraenkel, Leahy, Eisenberg & Fraenkel, Chicago, IL, for defendants.

### MEMORANDUM AND ORDER

FOREMAN, District Judge:

Before the Court is plaintiffs' Motion for Partial Summary Judgment against defendants Phoenix Assurance Company of New York, Commonwealth Insurance Company, Navigators Insurance Company, and Albany Insurance Company pursuant to Federal Rule of Civil Procedure 56.[1] Doc. No. 34. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

### I. Introduction

In the Summer of 1993 the Mississippi River and its tributaries experienced unprecedented flooding that affected nine Midwestern states. Twenty million acres of farmland were damaged, resulting in $6.5 billion in crop damage. The Great Flood of 1993 Post–Flood Report (U.S. Army Corps of Engineers September 1994), Doc. No 35, Tab 28 at A172. Total damage from the flood is estimated to be between $15 and $20 billion. *Id.* River, road, and rail transportation systems were disrupted on a large scale. *Id.*

Archer Daniels Midland Company and its subsidiaries (collectively, "ADM") process farm products for domestic and international consumption. As a result of the Great Flood of 1993, ADM incurred substantial extra expenses and losses of income because of increases in both transportation costs and the cost of raw materials. ADM submitted claims to its insurance providers, who paid ADM approximately $11 million for losses sustained from the flooding. *See* Compl.,

Doc. No. 1, Exs. The defendant insurance companies denied approximately $44 million in additional claims submitted by ADM, which precipitated this breach of contract action. *Id.*

### II. Background

Defendants sold ADM first-party property insurance and Difference-in-Conditions ("DIC") coverage to protect against perils not covered in the underlying property policy. At issue is the meaning of the "Extra Expense Coverage" ("EEC") and the "Contingent Business Interruption and Extra Expense Coverage" ("CBI") in the DIC policies.

ADM claims it is entitled to coverage under both provisions for the increased costs of transportation and raw materials it incurred as a result of the flood. The Court will address the applicability of both types of coverage after considering the propriety of plaintiffs' motion.

### III. The Propriety of the Motion for Partial Summary Judgment

■ Defendants argue that plaintiffs' motion pursuant to Rule 56 is improper because "it cannot result in 'judgment ... upon the whole case or for all the relief asked.....'" Doc. No. 45 at 5 (quoting Fed.R.Civ.P. 56(d)). Defendants further assert that "ADM's strategy is to file repeated motions, each addressing an additional element necessary to establish coverage." *Id.* However, ADM's attempt to resolve the specific issues addressed in its motion are not as sinister as defendants contend. "Summary judgment motions can help define, narrow, and resolve issues[ ]" prior to trial. Manual for Complex Litigation (Third) § 21.34 (1995) (supplement to James W. Moore, et al., Moores Federal Practice (2d ed. 1995)). As the Seventh Circuit has noted, the label "'partial summary judgment' is, of course, consistent with section (d) of Rule 56, which allows a court to establish facts prior to trial over which there is no 'substantial controversy.'" *ODC Communications Corp. v. Wenruth Invs.*, 826 F.2d 509, 515 (7th Cir.1987). The court also observed that it had previously addressed

---

1. ADM seeks partial summary judgment against all of the named defendants except Hartford Fire Insurance Company.

"the inherent ambiguity of the term partial summary judgment" in *Minority Police Officers Ass'n of South Bend v. City of South Bend,* 721 F.2d 197, 200 (7th Cir.1983), where it stated:

> We can get no help from the caption of the judge's order. The word "judgment" in the term "partial summary judgment" is a misnomer. A partial summary judgment is merely an order deciding one or more issues in advance of trial; it may not be a judgment at all, let alone a final judgment on a separate claim.

*Id; see also Victory Container Corp. v. Sphere Ins. Co.,* 448 F.Supp. 1043 (S.D.N.Y. 1978) (granting partial summary judgment on issue of defendants' maximum liability under insurance policy). Thus, whereas a grant of partial summary judgment may not resolve a separate *claim* for purposes of Rule 54(b), it is an appropriate mechanism for resolving separate *issues* prior to trial. Therefore, there is nothing improper in attempting to resolve such issues by seeking partial summary judgment.

## IV. Interpretation of the Policies

■ Contract interpretation is particularly suited to disposition by summary judgment. *Metalex Corp. v. Uniden Corp. of America,* 863 F.2d 1331 (7th Cir.1988). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Because neither party has raised the issue of choice of law in this diversity action, the Court will apply the substantive law of Illinois, the forum state. *Travelers Ins. Cos. v. Penda Corp.,* 974 F.2d 823, 827 (7th Cir.1992) (citing *Wood v. Mid-Valley, Inc.,* 942 F.2d 425, 426–27 (7th Cir. 1991)).

■ The construction of an insurance policy and its provisions is a question of law. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 698–99, 607 N.E.2d 1204, 1212 (1992). In construing an insurance policy, the Court's task is to ascertain the intent of the parties to the contract, "with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Id.*

(citations omitted). If the policy language is unambiguous, there is no issue of material fact, and the Court must determine the contract's meaning as a matter of law affording the contract language its plain, ordinary, and popular meaning. *Id.* But if the Court determines that the contract is ambiguous, the contract's meaning is a question of fact. *Dash Messenger Serv., Inc. v. Hartford Ins. Co. of Ill.,* 221 Ill.App.3d 1007, 164 Ill.Dec. 313, 316, 582 N.E.2d 1257, 1260 (1st Dist. 1991), *appeal denied,* 143 Ill.2d 637, 167 Ill. Dec. 398, 587 N.E.2d 1013 (1992). A policy provision is ambiguous only if it is subject to more than one reasonable interpretation. *Lapham–Hickey Steel Corp. v. Protection Mut. Ins. Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 463, 655 N.E.2d 842, 846 (1995) (citing *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.,* 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991)). A policy term is not ambiguous merely because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning. *Id.* (citations omitted).

### A. Extra Expense Coverage

■ Section 10(A) of the policies, entitled "Extra Expense" provides, in part:

A. General Provisions

*Interest Insured:* This policy is hereby extended to cove–1Xr "Extra Expense" sustained by the insured as a result of direct physical damage caused by the perils insured against under this policy and not excluded elsewhere in this form. . . .

ADM argues that Section 10(A) is unambiguous and the policies create only two preconditions for recovery of its claims for extra transportation and raw materials expenses: 1) the extra expense was incurred "as a result of direct physical damage" that was 2) "caused by the perils insured under this policy." Doc. No. 35 at 10–11. The defendants argue that the "extra expense" provision is limited to situations in which the insured's "described property" is damaged. Thus, under defendants' interpretation, damage to the property of suppliers of goods and services is not covered. Doc. No. 45 at 18.

██ In support of its argument that EEC provision is not limited to instances where direct physical damage occurs at scheduled locations, ADM observes that at least nine other sections of the policies specifically state that a provision's application depends on the property being insured under the property damage provision.[2] In response, the defendants contend that, looking at the policy as a whole, it is implicit that compensable claims must relate to damage to property at "scheduled" locations. However, "[w]hen attempting to limit liability, the insurer must show that the claim falls within the exclusion; exclusionary provisions, therefore, are applied only if their terms are clear, definite, and *explicit.*" *National Union Fire Ins. Co. v. Glenview Park Dist.*, 230 Ill. App.3d 578, 171 Ill.Dec. 780, 782, 594 N.E.2d 1300, 1302 (1st Dist.1992), *aff'd in part and rev'd in part,* 158 Ill.2d 116, 198 Ill.Dec. 428, 632 N.E.2d 1039 (1994) (emphasis added) (citing *Maryland Casualty Co. v. Chicago & N.W. Transp. Co.,* 126 Ill.App.3d 150, 81 Ill.Dec. 289, 466 N.E.2d 1091 (1st Dist.1984); *State Farm Fire & Casualty Co. v. Moore,* 103 Ill.App.3d 250, 58 Ill.Dec. 609, 430 N.E.2d 641 (2d Dist.1981)). Thus, seeking to have a court find implicit terms in an insurance policy is a questionable strategy under Illinois law.

██ It is well established that " 'contracts are to be interpreted as a whole, giving meaning and effect to each provision of the contract.' " *Arrow Master, Inc. v. Unique Forming Ltd.,* 12 F.3d 709, 713 (7th Cir.1993) (quoting *Mayfair Constr. Co. v. Waveland Assoc. Phase I Ltd. Partnership,* 249 Ill.App.3d 188, 188 Ill.Dec. 780, 788, 619 N.E.2d 144, 152 (1st Dist.), *appeal denied,* 153 Ill.2d 561, 191 Ill.Dec. 621, 624 N.E.2d 809 (Ill.1993)). "In construing a contract, it is presumed that all provisions were inserted for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Id.* (quoting

*Mayfair Constr. Co.,* 153 Ill.2d 561, 191 Ill. Dec. 621, 624 N.E.2d at 809) (internal quotation marks omitted).

Viewing the policy in its entirety, the most reasonable construction of the policy's failure to restrict coverage only to property at "scheduled" locations in Section 10(A)—while such a requirement is explicit in other provisions of the policy—is to conclude that the parties intended that property damage need not occur at a scheduled location for coverage to exist. This conclusion is consistent with the reasoning of *Travelers Insurance Companies v. Penda Corp.,* 974 F.2d 823 (7th Cir.1992). In *Penda Corp.,* the Seventh Circuit was presented with the issue of whether the defendant insurer had a duty to defend the plaintiff manufacturer that was being sued for supplying defective plastic sheets. The policy at issue stated that it covered liability incurred by the insured "because of ... property damage." *Id.* at 826. One of the arguments raised by the insurer was that it had no duty to defend because the plastic sheets in question belonged to the customer of the plaintiff in the underlying action, U.S. Sample, and therefore, U.S. Sample incurred no damage to its property. The Seventh Circuit panel rejected this argument, noting that the policy "does not state that it applies only to damage to property owned by the plaintiff on the underlying action." *Id.* at 830.

██ The reasoning of *Penda Corp.* is consistent with the general rule that a court "will not add terms to the contract of insurance which the parties have not included in the language of the policy." *Walsh v. State Farm Mut. Auto. Ins. Co.,* 234 N.E.2d 394, 399, 91 Ill.App.2d 156 (1st Dist.1968). In the case at hand, the defendants could have insisted that coverage under the EEC provision be limited to extra expense incurred as a result of damage to property at scheduled locations, but they did not. Such a requirement was stated in at least nine other places

2. Section 4 ("this policy insures against all risks of direct physical loss of or damage to the property insured); Section 6(R) ("the result of physical damage to insured property from a peril insured"); Section 8(G) ("property covered under this policy"); Section 8(J)(4) ("raw stock and finished products insured hereunder"); Section 11(A)(1) ("the cost of removal of debris of property covered hereunder"); Section 13(D) ("physical damage to other property insured by this policy"); Section 13(P) ("property or any party of the property insured hereunder"); *id.* ("preserving the insured property").

in the policy. After the insured has sustained a loss is too late to add such a restriction.[3]

Plaintiffs also rely on *Burdett Oxygen Company of Cleveland, Inc. v. Employers Surplus Lines Insurance Company*, 419 F.2d 247 (6th Cir.1969), which involved a claim for costs incurred when a piece of machinery broke down. The first section of the policy in question covered the insured's real and personal property against " 'all risks of direct physical loss of or damage to the property insured,' subject to certain specific exceptions for which the insurer offers no coverage." Thus, the first section covered only physical damage to tangible property and did not cover business interruption losses. *Id.* at 248. The second section covered losses "caused by damage to ... property ... by the perils insured against." *Id.* The policy excluded coverage for loss or damage "to machinery and equipment, caused by mechanical or electrical breakdown within such machinery or equipment." *Id.* The court reasoned that "[w]hile the only damage to tangible property by the mechanical breakdown was excluded from coverage, this fact does not negate the language of the contract which infers by the variation in the position of the phrase 'caused by' that a mechanical breakdown may be generally considered a 'peril insured against.' " The court reversed the district court and remanded the case with instructions to enter summary judgment in favor of the insured. *Id.*

Plaintiffs also cite *Sloan v. Phoenix of Hartford Insurance Company*, 46 Mich.App. 46, 207 N.W.2d 434 (1973), which addressed the issue of whether losses claimed by the insured theater, incurred because of a curfew imposed in the wake of rioting in Detroit, were covered in the absence of physical damage to the theater. One section of the policy provided coverage for loss "resulting directly from necessary interruption of business

caused by damage to or destruction of real or personal property by peril(s) insured against. . . ." *Id.* at 436. The policy covered such losses for only so long as it took to repair or replace the damaged property with the exercise of due diligence. *Id.* Another section of the policy covered losses incurred "during the period of time, not exceeding 2 consecutive weeks, when as a direct result of the peril(s) insured against, access to the premises described is prohibited by order of civil authority." *Id.* The court observed that this last provision failed to specifically require physical damage to the premises as a prerequisite for coverage and it was too late to rewrite the policy to add such a condition. *Id.* Moreover, the court found that to imply a requirement of physical damage into the provision would be illogical because there was no rational relationship between the "reasonable time" within which to effect repairs under the first section and the two-week limit under the second. *Id.*

Similarly, in *American Home Assurance Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22 (1st Cir.1986), the First Circuit reversed the district court's summary judgment in favor of the insurer. The court reasoned that the insurer could not deny coverage because the plain language of the insurance policy at issue did not preclude the possibility that physical injury to the insured's own property can constitute "physical injury to tangible property." *Id.* at 25–25. The court noted that "any alternative reading resulting in non-coverage for the insured would actually require us to add language to the policy against the insured, standing on its head the general insurance principle that policies are to be strongly construed against the insurer." *Id.* at 26 (citing *Essex House v. St. Paul Fire & Marine Ins. Co.*, 404 F.Supp. 978, 986 (S.D.Ohio 1975)).

---

3. The defendants contend that ADM wrote the policy language at issue and, therefore, under the *contra proferentum* doctrine, any ambiguities in the policies should be construed against ADM. Doc. No. 45 at 7. However, because the Court finds the policy language to be unambiguous, the *contra proferentum* doctrine does not apply. *USG Interiors, Inc. v. Commercial and Architectural Prods, Inc.*, 241 Ill.App.3d 944, 182 Ill.Dec. 277, 281, 609 N.E.2d 811, 815 (1st Dist.1993) (citations omitted); *accord Bunge Corp. v. Northern Trust Co.*, 252 Ill.App.3d 485, 191 Ill.Dec. 195, 200, 623 N.E.2d 785, 790 (4th Dist.1993) (observing that *contra proferentum* doctrine is "a secondary rule of interpretation, a last resort which may be invoked after all the ordinary interpretative guides have been exhausted.").

The persuasive authority of *Burdett, Sloan* and *American Home Assurance* is diminished by those courts' application of the *contra proferentum* doctrine. *American Home Assurance*, 786 F.2d at 26; *Sloan*, 207 N.W.2d at 435–436; *Burdett*, 419 F.2d at 250. This doctrine does not apply in the case at hand because the Court has determined that the policy language at issue is unambiguous. *See infra* note 3. However, the analyses of these decisions is persuasive apart from having construed any ambiguities in favor of the insured. All three cases interpreted the plain meaning of the contract language and refused to read into the policies language that was not contemplated by the parties to the contracts.

Defendants rely on *Swedish Crucible Steel Co. v. Travelers Indemnity Co.*, 387 F.Supp. 231 (E.D.Mich.1974), to support their claim that the intent of the policies was "to limit the coverage and exposure for extra expense for those situations where there was direct physical damage to the insured's own described property." Doc. No. 45 at 20. However, the policy at issue in *Swedish Crucible* provided for business interruption losses caused by "damage to or destruction of personal property ... *on premises occupied by the insured and situated as herein described.*" *Swedish Crucible*, 387 F.Supp. at 233 (emphasis added). Thus, *Swedish Crucible* is distinguishable from the case at hand in that the policy language in that case expressly stated that the covered property was limited to that on the premises of the insured and as described in the policy.[4]

For the foregoing reasons, the Court finds that the language of Section 10(A) is unambiguous and does not require that "direct physical damage" be to property insured under the property damage coverage of the policies or be to property at scheduled locations. Accordingly, ADM's Motion for Partial Summary Judgment (Doc. No. 34) is **GRANTED** with respect to Section 10(A) of the applicable policies.

**B. Contingent Business Interruption and Extra Expense Coverage**

Section 13(Q) of the policies provides in pertinent part:

> This policy covers against loss of earnings and necessary extra expense resulting from necessary interruption of business of the insured caused by damage to or destruction of real or personal property, by the perils insured against under this policy, of any supplier of goods or services which results in the inability of such supplier to supply an insured locations [sic].

ADM argues that it is entitled to coverage under this section of the policies for the increased costs it incurred for transportation and raw materials. Specifically, ADM contends that Midwest farmers and the United States government, through the Army Corps of Engineers ("Corps"), which operates and maintains the Mississippi River system, and the United States Coast Guard are "suppliers of goods and services" under the policies.

The Court's analysis of the CBI coverage differs from that of the EEC coverage in that neither party asserts, and the Court does not find, that Section 13(Q) is ambiguous. Thus, the interpretation of Section 13(Q) is limited to whether the Midwest farmers or the government agencies in question are "suppliers of goods and services" under the terms of the policies.

*Transportation Claims*

A substantial part of ADM's raw materials travel by barge on the Mississippi River and its tributaries. When barge traffic was halted because of the flooding, ADM had to

---

4. Defendants cite an insurance industry publication to support their claim that the word "property" was inadvertently omitted from Section 10(A), and without it, the sentence "makes no sense." Doc. No. 45 at 19. However, when contract terms are clear and unambiguous, they must be given their ordinary and natural meaning, and no parol or extrinsic evidence may be considered to vary the meaning of the terms. *Rothner v. Mermelstein*, 219 Ill.App.3d 502, 162 Ill.Dec. 208, 213, 579 N.E.2d 1022, 1027 (1st Dist.1991), *appeal denied*, 143 Ill.2d 648, 167 Ill.Dec. 410, 587 N.E.2d 1025 (1992) (citing *Susmano v. Associated Internists of Chicago, Ltd.*, 97 Ill.App.3d 215, 52 Ill.Dec. 670, 673, 422 N.E.2d 879, 882 (1st Dist.1981); *Katz v. Diabetes Ass'n of Greater Chicago*, 31 Ill.App.3d 240, 333 N.E.2d 293, 295 (1st Dist.1975)). Therefore, the Court will not consider extrinsic evidence and will limit its analysis to the plain meaning of the policy language.

arrange alternate—and more expensive—transportation by rail. Mills Decl., Doc. No. 35, Attach. at A340, ¶ 15. ADM argues that the plain language of Section 13(Q) supports its assertion that its costs for alternate transportation are recoverable under the policies.

■ Because the Court finds Section 13(Q) unambiguous, the Court must determine the contract's meaning as a matter of law affording the contract language its plain, ordinary, and popular meaning. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992). The key phrase for present purposes is "any supplier of goods or services." The word "any" is defined as "[o]ne or another without restriction or exception." Webster's II New Riverside University Dictionary 114 (1984). The term "supply" means "to furnish with what is needed or desired." Funk and Wagnalls New Standard Dictionary of the English Language 2427 (1940). A "supplier" is "one who or that which supplies." *Id.* Thus, the phrase "any supplier of goods or services" denotes an unrestricted group of those who furnish what is needed or desired. Because the parties do not dispute the meaning of the term "any," they focus most of their attention on the issue of whether the Corps or the Coast Guard is a supplier of services to ADM.[5]

The United States Coast Guard administers the U.S. Aids to Navigation System, *see* 14 U.S.C. § 81; 33 C.F.R. §§ 62.1–62.65, under which the Coast Guard "maintains systems of marine aids to navigation consisting of visual, audible, and electronic signals which are designed to assist the prudent mariner in the process of navigation." 33 C.F.R. § 62.1(c). Under the Flood Control Act of 1936, 33 U.S.C. §§ 701–709a, the U.S. Army Corps of Engineers is charged with developing a flood control system on the Nation's rivers. 33 U.S.C. § 701a. One of the reasons for implementing the system was to prevent "the erosion of lands, and impairing and obstruction navigation, highways, railroads, and other channels of commerce between the states." *Id.*

Defendants contend that the function of the Coast Guard and the Corps is "to promote and facilitate transportation through the construction of physical improvements and the regulation of use—traffic control." Doc. No. 45 at 15. Defendants argue that these government entities do not provide services to any individual user, but rather, design and develop systems "for the overall improvement of what might otherwise be a less than desirable condition." *Id.* In support of this argument, the defendants assert that the Mississippi River was navigable prior to the installation of locks and dams, and the Corps's improvements merely made it "a more desirable and efficient means of transportation." *Id.*

Regardless of the navigability of the Mississippi River prior to the installation of locks and dams, the "construction of physical improvements" that result in "the overall improvement of what might otherwise be a less than desirable condition" is nonetheless a service. It cannot fairly be argued that one who paves a homeowner's dirt driveway does not provide a service merely because the driveway was useable in its unpaved condition. By constructing improvements on the Mississippi River, the Corps is undoubtedly providing a service. As a result, the Corps and the Coast Guard are "suppliers" of "services" for purposes of Section 13(Q) unless they are exempted from such a designation by virtue of the fact that they are government entities.

Defendants argue that the Corps and the Coast Guard primarily serve a regulatory function similar to that of the Federal Aviation Administration ("FAA") and the United States Department of Transportation ("DOT"). The Court agrees with plaintiffs' argument that defendants' analogy to the FAA fails because the FAA did not make the airspace in which planes travel a commercially viable means of transportation—it merely regulates the use of the air space and the safety of aircraft. In contrast, the Corps and the Coast Guard made significant physical improvements in the Mississippi River system. Thus, the role of those agencies is distinguishable from that of the FAA in that

---

5. Neither party raises the issue of whether either

government entity is a supplier of goods to ADM.

they do not serve an exclusively regulatory function.

ADM also argues that the Corps and the Coast Guard provide a service because ADM pays a "user charge" for its use of the Mississippi River through the excise tax it pays on fuel. Doc. No. 35 at 21–22. In response, defendants contend that Corps and the Coast Guard are similar to the DOT in that they do not provide goods or services to individual users. Doc. No. 45 at 15. Defendants note that ADM does not pay a fee to use the locks on the Mississippi River and the excise tax is collected whether or not ADM uses the locks or not just as automobile drivers pays fuel taxes regardless of whether they use the interstate highway system.

However, defendants fail to address the authority cited by ADM to support its claim that it pays taxes in exchange for services.[6] ADM primarily relies on *Augusta Towing Co., Inc. v. United States*, 5 Cl.Ct. 160 (Ct.Cl. 1984), in which commercial barge operators challenged the constitutionality of the Inland Waterways Revenue Act, which imposes the tax on fuel used by vessels engaged in commercial waterway transportation on twenty-six waterways. The court rejected the argument that the tax violated the Tax Uniformity Clause—which requires that a tax operate with the same force and effect wherever the subject of the tax is found—on the grounds that the Supreme Court has "consistently recognized that the interests protected by these Clauses are not offended by revenue measures that operate only *to compensate a government for benefits supplied.*" *Id.* at 166 (quoting *Massachusetts v. United States*, 435 U.S. 444, 462, 98 S.Ct. 1153, 1165, 55 L.Ed.2d 403 (1978)) (internal quotation marks omitted) (emphasis added). The court noted that a "user charge is one type of revenue measure designed to compensate the Government *for supplying a benefit to the user....*" *Id.* at 167 (emphasis added).[7] Thus, the *Augusta Towing* court explicitly

recognized that the excise tax paid by commercial users of the inland waterway system was "designed to compensate the Government for supplying a benefit to the user...." *Id.* Although the question before the *Augusta Towing* court did not involve the interpretation of an insurance policy, the reasoning employed by the court is persuasive for the issue at hand. Funding the construction and maintenance of the physical infrastructure of the Mississippi River system through the fuel taxes imposed on the users of that system easily brings the Corps and the Coast Guard within the plain meaning of the term "any supplier of goods and services."

ADM observes that the Supreme Court has long recognized the importance of the government's services to the users of the inland waterway system. In *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 334, 13 S.Ct. 622, 629, 37 L.Ed. 463 (1893), the Court stated:

> A river, to be sure, is a natural channel; but, if it is not a navigable one, it can no more be used for the purposes of commerce than the land, and therefore to convert it from the mere natural channel into a public highway, for commercial purposes, and to levy a toll to reimburse the expense [is within Congress's power under the Commerce Clause].

Similarly, in *Huse v. Glover*, 119 U.S. 543, 548, 7 S.Ct. 313, 315–16, 30 L.Ed. 487 (1886), the Court noted that the "exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream" and in return for "outlays caused by such works the state may exact reasonable tolls. They are like charges for the use of wharves and docks constructed to facilitate the landing of persons and freight, and the taking them on board, or for the repair of vessels."

---

6. The defendants cite no authority to support their argument that the Corps and the Coast Guard are not suppliers of goods or services.

7. With respect to the argument that the tax was not sufficiently proportionate to the value of the navigational improvements to the users, the *Au-*

*gusta Towing* court observed that in analogous state highway toll cases, the Supreme Court has sustained numerous tolls based upon a variety of measures of use. *Id.* at 167 (citing *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 715, 92 S.Ct. 1349, 1354–55, 31 L.Ed.2d 620 (1972)).

Government entities have been recognized as playing a dual role in commerce, that of "regulator" and that of "market participant." *See, e.g., Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976); *J.F. Shea Co., Inc. v. City of Chicago,* 992 F.2d 745 (7th Cir.1993). Defendants offer no authority to support their claim that the Coast Guard and the Corps serve a solely "regulatory" function by facilitating commerce on the Mississippi River. The authority cited by ADM supports the proposition that these agencies are not precluded from being considered "suppliers of goods and services" by virtue of the fact that they are government entities.

Defendants further argue that the government entities cannot be a supplier of services because ADM does not have a contract with the Corps or the Coast Guard for such services. *Id.* In addition, the defendants note that the principal entity that supplies ADM's insured locations is ADM's subsidiary, American River Transportation Co. ADM persuasively argues in its reply that the policies do not state that coverage is limited to principal suppliers or suppliers with whom ADM has a written contract, rather, they apply to "any" supplier. Doc. No. 63 at 13. Thus, defendants' argument is rejected.

Defendants next argue that "[t]o hold that the Federal Government is a supplier of services to ADM and other users of the river would make the Federal Government responsible for any breach of these 'services.' Has ADM sued the U.S. Government for its failure to provide transportation services? Could it?" The answer to the first question is "no." The answer to the second is "maybe." ADM has not sued the U.S. Government, presumably because ADM did not believe that the government had breached any duty owed to ADM. There was little the government could do to make river transportation possible in the face of one of the worst floods on the Mississippi River in recorded history. In fact, the government could have subjected itself to substantial liability if it had permitted commercial traffic on the river under such circumstances. Had the Corps

or the Coast Guard been negligent in its operation of the river system they may have been subject to liability. *See, e.g., Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (holding that discretionary function exception to the Federal Tort Claims Act did not bar claim that government agencies permitted licensing and distribution of unsafe polio vaccine); *Indian Towing Co., Inc. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (holding that Coast Guard's failure to maintain a lighthouse subjected the government to liability under the FTCA). Therefore, the Court finds defendants' argument unpersuasive.

The defendants also argue that: 1) none of the locks or dams on the Mississippi River were "damaged" within the meaning of Section 13(Q); and 2) if there was such damage, there was no causal connection between the damage and the restriction of barge traffic because the Coast Guard restricted barge traffic while all locks were still operational. Whereas this issue must be resolved before ultimately deciding whether ADM's transportation claims are covered under the policies, this is a factual issue that is not before the Court for purposes of the present motion. The present inquiry is limited to whether the Corps and the Coast Guard are suppliers of goods and services.

For the foregoing reasons, ADM's Motion for Partial Summary Judgment (Doc. No. 34) is **GRANTED** to the extent that the Court concludes that the United States Coast Guard and the Army Corps of Engineers are suppliers of goods and services within the meaning of Section 13(Q) of the applicable insurance policies.

### Raw Materials Claims

ADM argues that the Midwest farmers who grow the crops that ADM processes are also "suppliers of goods and services" within the meaning of Section 13(Q). In response, the defendants contend that the farmers are not suppliers because ADM does not contract for the purchase of grain from individual farmers. Rather, ADM purchases grain from licensed grain dealers. In support of this assertion, defendants rely on the deposition testimony of Brian West, a grain

merchandiser at ADM's Cedar Rapids, Iowa, facility. Doc. No. 45, Tab 14. West testified that from his experience, ADM purchases approximately ninety percent of its wheat from resellers, who are licensed grain dealers that either purchased the grain directly from farmers or from other dealers. *Id.* at 42, 47. The other ten percent is purchased from farmer cooperatives and grain elevators. *Id.* at 47. ADM does not pay farmers directly for grain. *Id.* at 48.

In reply, ADM argues that the policy language does not limit coverage to "contractual suppliers," "direct suppliers," or "immediate suppliers." Doc. No. 43 at 15. Moreover, ADM notes that the policies do not require direct contractual privity between ADM and its suppliers. *Id.* The Court's task is to ascertain the intent of the parties to the contract, "with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992). (citations omitted). ADM purchased the CBI insurance " 'to protect the insured from the increased cost of 'cover' arising out of a supplier's misfortune,' and such coverage insures the losses resulting from insured's suppliers have been damaged and, 'in order to avoid an interruption of business, [the insured must] obtain the necessary goods or services, 'cover,' from another source.' " Doc. No. 63 at 14 (quoting defendants' brief, Doc. No. 45 at 9) (original alteration).

ADM is correct in its assertion that the policy language does not limit coverage to those suppliers in direct contractual privity. Moreover, the problem of remote claims— such as a claim that ADM's business was interrupted because of damage to a supplier of the farmers—does not arise under Section 13(Q). The goods at issue is the grain grown by the Midwest farmers. The grain is produced by the farmers and sold to grain dealers, who then sell it to ADM. The farmers may be an "indirect" supplier of the grain, but they are a supplier nonetheless. Had either of the parties wanted to limit the coverage to "direct" suppliers, they could easily have added language to that effect.

Defendants also contend that "the clear intent of the policy is to increase the scope of coverage" to include business interruption losses under Section 10(A) and contingent business interruption losses incurred by non-insured parties under Section 13(Q) without changing the scope of the property insured or excluded or the perils insured or excluded. Defendants view ADM's interpretation of the policies as resulting in "duplicative coverages." Doc No. 45 at 18. However, ADM is not seeking a double recovery for its losses. In fact, the policy issued by Navigators Insurance Company provides that "[i]f two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage." Doc. No. 35, Attach. at A108. The policies issued by the other defendants do not contain similar language. However, because ADM does not seek to recover under both Section 10(A) and 13(Q), any potential duplication in coverage is irrelevant.

For the foregoing reasons, ADM's Motion for Partial Summary Judgment (Doc. No. 34) is **GRANTED** to the extent that the Court concludes that the Midwest farmers who supply raw materials to ADM are suppliers of goods and services within the meaning of Section 13(Q) of the applicable insurance policies.

### Summary

The Court finds that the language of Sections 10(A) and 13(Q) of the applicable insurance policies is unambiguous. Section 10(A) does not require that "direct physical damage" be to property insured under the property damage coverage of the policies or be to property at scheduled locations. The U.S. Army Corps of Engineers, the Coast Guard, and Midwestern farmers who supply raw materials to ADM are suppliers of goods and services within the meaning of Section 13(Q). Accordingly, ADM's Motion for Partial Summary Judgment (Doc. No. 34) is **GRANTED** in its entirety.

**IT IS SO ORDERED.**