**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MILLVILLE QUARRY, INCORPORATED,
            *Plaintiff-Appellant,*

v.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

            *Defendant-Appellee.*

No. 01-2122

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
W. Craig Broadwater, District Judge.
(CA-98-4-3)

Argued: February 25, 2002

Decided: March 19, 2002

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

---

Affirmed and remanded by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Howard Gary Goldberg, GOLDBERG, PIKE & BES-
CHE, P.C., Baltimore, Maryland, for Appellant. Walter Minitre Jones,
III, MARTIN & SEIBERT, L.C., Martinsburg, West Virginia, for
Appellee. **ON BRIEF:** Michael A. Simpson, GOLDBERG, PIKE &
BESCHE, P.C., Baltimore, Maryland, for Appellant. James W.
Logan, Jr., James D. Jolly, Jr., LOGAN, JOLLY & SMITH, L.L.P.,
Anderson, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

In this diversity insurance dispute, Millville Quarry, Incorporated appeals from the district court's order granting summary judgment in favor of its insurer, Liberty Mutual Fire Insurance Company. Millville contends that a policy issued by Liberty entitles it to greater recovery for expenses it incurred after a flood. For the reasons set forth below, we affirm and remand.

### I.

Millville owns and operates a quarry located in Millville, West Virginia. J.A. 534. Four permanent water pumps, which were designed to remove natural accumulations of water from the quarry, were affixed to a stationary platform inside the quarry approximately 25 feet above the quarry floor. *Id.*

In April 1997, the quarry flooded when water entered through the quarry wall and floor. *Id.* The flood waters submerged the pumps, rendering them inoperable, and caused Millville to suspend its quarrying operations. J.A. 206, 366, 534-35.

In order to remove the water, Millville initially leased and installed temporary diesel-powered pumps. J.A. 391, 535. These pumps proved inadequate, however, to discharge the flood waters, which continued to flow into the quarry at a variable rate of 15,000 to 35,000 gallons per minute (gpm). J.A. 534. Millville therefore increased the pumping capacity inside the quarry to 29,000 gpm by adding four more pumps, which it mounted on a floating barge. J.A. 391, 535. These four pumps were the same type and model as the four original pumps, although they were powered by diesel fuel, rather than electric power. J.A. 189, 191, 391-92. Millville first floated this pump barge on May 19, 1997, by which time the water level had peaked at 85 feet above

the quarry floor. J.A. 535. According to Millville, however, the pumps on the barge did not become fully operational until June 3, 1997, due to "a faulty breaker and constant interruptions of service due to electrical switch gear problems." J.A. 515, 540.

The new pumps on the pump barge, together with the temporary, portable pumps, were still insufficient to compensate for the water inflow. J.A. 535. By mid-August 1997, Millville had floated a second pump barge, mounted with yet more pumps, to achieve a total pumping capacity of 33,000 gpm. J.A. 536. The combination of the two pump barges plus the temporary pumps succeeded in stabilizing the water level, albeit at a level above the four original permanent pumps and platform, and Millville was able "to successfully continue mining operations" by the end of October. J.A. 393, 515. Millville nonetheless determined that its network of pumps would be unable, over the long term, to substantially lower the water level or reduce the water inflow, which it predicted would increase over time, and concluded that "[p]umping after the water has entered the quarry will exacerbate, not solve the present [water] situation." J.A. 56.

Millville then searched for means, other than the ongoing addition of pumps, to further reduce the water level and prevent future flooding problems. Millville's retained experts, after a water inflow investigation, opined that the flood waters were entering the quarry through conduits that had developed in underground limestone formations. J.A. 536. Beginning in late fall and early winter, contractors hired by Millville grouted the formations with cement and hot bituminous material. J.A. 68, 536. According to Millville, this grouting procedure succeeded in lowering the water level in the quarry and in eliminating or substantially reducing further water inflow from the Shenandoah River. J.A. 469.

During the period in which these events occurred, Millville was a named insured under a policy issued by Liberty, and its quarry was a "covered location" under this policy. J.A. 533-34. The policy provided potential coverage to Millville for damage attributable to the flood under two provisions: the Basic Property coverage and the Additional Expense coverage. For purposes of both the Basic Property coverage and the Additional Expense coverage, the "covered property" includes only the four permanent pumps and platform, and

not the land or quarried stone. J.A. 534. The parties also do not dispute that the flood was a "covered cause of loss" that damaged the permanent pumps and platform. J.A. 534.

Under its Basic Property coverage from Liberty, Millville was entitled to (1) the "replacement cost" of the four permanent pumps and platform "if actually repaired or replaced," or (2) the "actual cash value" of the permanent pumps and platform "[i]f . . . not repaired or replaced." J.A. 298-99. In the event Millville was entitled to the "replacement cost," the policy limited Liberty's obligation to no more than either (a) the cost to replace the four permanent pumps and platform, "on the same site, with other property of identical material and used for the same purpose" or (b) the cost to repair the four permanent pumps and platform "with property of comparable material and quality and used for the same purpose." J.A. 299.

The Additional Expense provisions of the policy provided coverage to Millville for the "actual and necessary 'additional expense'" Millville incurred "due to 'loss,' caused by or resulting from COVERED CAUSE OF 'LOSS', to COVERED PROPERTY[.]" J.A. 306 (emphasis in original). The policy defines the term "Additional expense" as "all expenses that exceed the 'normal' operating expenses of [the insured's] 'operations' during the 'period of recovery.'" J.A. 307. The "period of recovery," in turn, is defined as the period between the date of the direct physical loss of the permanent pumps and platform and the date on which the permanent pumps and platform "should be repaired, rebuilt or replaced with reasonable speed and similar quality." *Id.*

Pursuant to the Additional Expense provisions, Millville submitted installments of costs incurred on its flood claim to Liberty Mutual at various intervals. J.A. 535. Millville apportioned these costs across four categories: operating interim or replacement water pumps ("pumping activities"), totaling $1,452,873.50; constructing and maintaining floating pump barges, totaling $923,129.40; conducting water inflow investigations, totaling $428,514.04; and grouting the underground conduits, totaling $6,191,572.50. J.A. 34. Millville also maintained that it was entitled to the replacement cost of the four permanent pumps and platform pursuant to its Basic Property coverage. J.A. 35.

Liberty Mutual advanced $450,000 to Millville, pursuant to the Additional Expense provisions, toward the costs of pumping activities. J.A. 541. In addition, Liberty Mutual agreed to pay the replacement cost of the four permanent pumps and platform, subject to the policy's limitations, once Millville submitted "documentation relating to the damaged pumps." J.A. 70, 144. Liberty Mutual denied coverage, however, for the cost of continuing pumping activities, constructing and maintaining floating barges, conducting water inflow investigations, and grouting the limestone conduits on the ground that they were not covered under the Basic Property or the Additional Expense provisions. J.A. 69-70.

On February 6, 1998, Millville filed this action against Liberty Mutual to recover all disallowed costs. J.A. 12-17. In its amended complaint, Millville assessed these costs as having climbed to more than $10,000,000. J.A. 207; R. Vol. II (Tab 63, at 3). The parties then entered stipulations of fact and filed cross-motions for summary judgment. J.A. 25-70; 71-92.

On March 29, 1999, the district court granted summary judgment to Liberty Mutual, stating that Millville was not entitled to recover the cost of its grouting procedures because such costs were not "necessary to attempt to recover those permanent pumps," but instead were incurred "to prevent the further inflow of water into the quarry in order either to restore mining operations or to recover the land," neither of which were covered by the policy. J.A. 372-82. The court did not address the parties' dispute with respect to the scope of pumping activities covered by the policy, the pump barges, or the water inflow investigations, except to conclude that Liberty Mutual had "fulfilled its obligations under the Policy" through its "advances of $450,000 [paid] primarily for pumping operations and related expenses." J.A. 380.

The district court denied Millville's subsequent motion to clarify or amend, but stated that in its view the pump barges, like the grouting procedures, were not covered under the policy and that Liberty Mutual "will be entitled to a credit for the amount of $450,000 which has already been paid" once Millville "finalizes and documents its claims." J.A. 433-38. The court then informed the parties that although it was dismissing the case with prejudice, "any party may

move to reopen the case, provided that such motion is filed within ninety (90) days of the date of this Order." J.A. 438.

Millville appealed from the district court's order. We remanded the case without reaching the merits of Millville's appeal because certain issues remained unresolved and because the district court's order allowing parties to reopen the case violated the "final judgment rule." *See Millville Quarry, Inc. v. Liberty Mut. Fire Ins. Co.*, No. 99-2169, 2000 WL 1005202 (4th Cir. July 20, 2000). On remand, the parties again filed cross-motions for summary judgment. J.A. 470-518. This time, the parties set forth the remaining disputes, and their respective positions as to these disputes, in a "Stipulation of Procedural History" signed by both parties and the district court. J.A. 533-48.

On August 15, 2001, the district court granted summary judgment to Liberty Mutual "on outstanding issues." J.A. 577-80. With respect to the Basic Property coverage, the court held that as the "replacement cost" of the four permanent pumps and stationary platform, Millville was entitled to recover the original cost, $151,322.17, "less its deductible." J.A. 577. The court further held that Millville was not entitled to recover the cost of the construction of the pump barges, the water inflow investigations, or the grouting procedure because none was necessary to recover the permanent pumps. J.A. 578-79. Finally, the court granted summary judgment to Liberty Mutual "as to the dates [Millville] replaced the permanent pumps with the Pump Barges and the amount [Millville] is thereby entitled to recover for the Pump Barges under the 'Additional Expense' coverage provisions of the policy." J.A. 579. The court then dismissed the action, ruling that "any and all obligations" owed by Liberty to Millville had been "resolved by payment and satisfaction." J.A. 580.

## II.

Millville appeals the district court's orders entering summary judgment to Liberty Mutual. We review a district court's grant of summary judgment *de novo*. *Miller v. AT&T Corp.*, 250 F.3d 820, 830 (4th Cir. 2001). Here, the parties do not dispute the relevant facts, and thus the inquiry is whether the district court properly applied the law to those facts. *Hopkins v. AT&T Global Info. Solutions Co.*, 105 F.3d 153, 155 (4th Cir. 1997).

A.

As to the Basic Property coverage, Millville challenges the district court's determination that it was entitled only to $151,322.17, "less its deductible," as the "replacement cost" of the four permanent pumps and platform. Millville's sole contention on the Basic Property coverage is that because the district court ruled that it "replaced" its permanent pumps with the first floating pump barge, it is entitled to the cost of the floating pump barge as its "replacement cost."

This contention fails because the insurance policy expressly limits recovery of the "replacement cost" to the cost to replace the four permanent pumps and stationary platform, "on the same site, with other property of identical material and used for the same purpose" or the cost to repair them "with property of comparable material and quality and used for the same purpose." Millville admits that the floating pump barge was qualitatively different from the four permanent pumps and stationary platform, and therefore was not property of "identical" or "comparable material." J.A. 514 (Millville stating that "pump barges and pumps installed on them were not of 'similar quality' to the stationary platform and pumps"). Millville further acknowledges that if it is not entitled to the cost of the floating barge as part of the "replacement cost," then the original cost of the four permanent pumps and stationary platform, or $151,322.17, represents an adequate measure of the "replacement cost" of comparable equipment. *See* J.A. 514, 518 n.a.

Given these concessions, the district court correctly held Millville entitled to $151,322.17 (less its deductible) for the "replacement cost" of the four permanent pumps and stationary platform under the Basic Property coverage. *See Georgia-Pacific Corp. v. Allianz Ins. Co.*, 977 F.2d 459, 461-62 (8th Cir. 1992) ("The policy makes clear that [the insurer] will pay the lesser of repairing or replacing the property. If the insured decided to replace the property with property of a better kind or quality or of a larger capacity, [the insurer] will not pay for the extra cost.").

B.

With respect to the Additional Expense coverage, Millville argues that it is entitled to the cost of pumping water after the first pump

barge was floated, constructing the pump barges, conducting water inflow investigations, and grouting the underground conduits — a series of costs amounting to more than $10,000,000. J.A. 176, 518; R. Vol. II (Tab 42, at 2). In support of its claim for these costs, Millville relies on and seeks the benefit of the policy language providing that "additional expenses" are "expenses that exceed the 'normal' operating expenses of [Millville's] 'operations' during the 'period of recovery.'" J.A. 307. Millville further argues that the only causation requirement is that the additional expenses be "due to" the flood. Millville ignores, however, the express language and threshold limitation of the Additional Expense provision, which requires the expenses to be "actual and necessary" expenses "due to 'loss,' caused by or resulting from [the flood], *to covered property*," i.e., the four permanent pumps and platform, not all expenses "due to" loss caused by the flood. (Emphasis added.) *Cf. Archer-Daniels-Midland Co. v. Phoenix Assurance Co.*, 936 F. Supp. 534 (S.D. Ill. 1996) (recognizing that "extra expense" provision in policy covered liability "incurred as a result of damage to covered property").

None of the additional expenses for which Millville seeks to recover are "due to" damage to the permanent pumps and platform. The operation of additional pumps after the first pump barge was floated, the construction of the pump barges, the water inflow investigations, and the grouting of the underground conduits would have been required even if Millville's four permanent pumps had remained operational because the water inflow beginning in April 1997 exceeded the pumping capacity of the permanent pumps, making the rising or fluctuating water level unavoidable. Indeed, Millville has conceded that by October 1997, pumping activities were exacerbating the water inflow problems rather than remedying them. Furthermore, once Millville floated the first pump barge mounted with four pumps identical to its four permanent pumps, and operated those pumps in addition to temporary portable pumps, it proved its expenses were not "due to" damage to the permanent pumps and platform; the status of the quarry was exactly as (or better than) if the permanent pumps were operational.[1]

---

[1] We do not fault Millville for any of its undertakings in remedying the effects of the flood and employing measures to prevent future floods.

Similarly, it is clear that the "period of recovery," which imposes a temporal rather than substantive limitation on the Additional Expense coverage, ended on May 19, 1997, when the first pump barge was floated. At that time, pumps having a total pumping capacity of 29,000 gpm should have been operational.[2] Millville's ability to operate pumps identical to its permanent pumps, from an alternative power source and on an alternative platform that would account for the fluctuating water level, demonstrates that the permanent pumps "should be repaired, rebuilt or replaced with reasonable speed and similar quality" by this date.

This result accords with the district court's grant of summary judgment *in favor of Liberty* "as to the dates [Millville] replaced the permanent pumps with the pump barges," J.A. 579, because this date can only be May 19, 1997. This is so because (consistent with its position throughout the litigation) Liberty, in its motion for summary judgment, after reciting the Stipulations of Procedural History verbatim, expressly requested that the district court find "that Millville is entitled to Additional Expense Coverage for pumping operations through May 19, 1997, when Pump Barge 1 was floated." (J.A. 504) In addition, this is the only date from which the district court could conclude from the Stipulation of Procedural History, without resolving factual disputes, that Liberty's payment of $450,000 satisfied its obligations

---

Such efforts presumably constituted a wise business decision if, as Millville predicted, erosion of the underground limestone conduits would have led to future flooding problems and business interruption. Nonetheless, to the extent that the permanent pumps, or even a greater total of pumps used after the flood, were incapable of remedying Millville's water problems, the district court correctly concluded that the costs were incurred "to either restore mining operations or to recover the land" and thus cannot be said to be "due to" damage to the permanent pumps.

[2]Millville argues that the "period of recovery" continued at least until June 3, 1997, when the pumps on the first pump barge were operational, due to "a faulty breaker and . . . electrical switch gear problems." J.A. 515. This contention fails because these complications were unrelated to damage to the permanent pumps or to the flood. Thus the May 19 date appropriately represents the date on which the permanent pumps "*should be* repaired, rebuilt or replaced with reasonable speed and similar quality." (Emphasis added.)

under the Additional Expense coverage.[3] The bulk of the costs for which Millville seeks Additional Expense coverage, including pumping activities conducted after May 19, 1997, construction of the second pump barge, water inflow investigations undertaken after May 19, 1997, and grouting of the underground conduits therefore are further barred as occurring outside the "period of recovery."

## C.

Finally, Millville challenges the district court's determination that Liberty's payment of $450,000 satisfies all of its obligations under the policy. Millville argues, and Liberty agrees, that Liberty's payment of $450,000 satisfies only its Additional Expense coverage obligation, and that Liberty's obligation to compensate Millville for the "replacement cost" of the permanent pumps and platform under the Basic Property coverage remains outstanding. We therefore remand to the district court for an order granting Millville $151,322.17, less its deductible, under its Basic Property coverage, in addition to the $450,000 already paid by Liberty in satisfaction of Millville's claim under the Additional Expense provision.

## III.

For the reasons set forth above, we affirm the district court's grant of summary judgment in favor of Liberty, but remand for entry of an order granting Millville judgment in the amount of $151,322.17, less its deductible, for the "replacement cost" of the permanent pumps and platform pursuant to its Basic Property coverage.

*AFFIRMED AND REMANDED*

---

[3]Although Liberty stated that it would have paid only $394,116.49 of Millville's pumping costs through May 19, 1997, Liberty accepts that its advance of $450,000 fully satisfies its Additional Expense obligations because it has never made any claim for set-off or reimbursement and only argued for a credit of that amount in the event it was held responsible for a greater sum. J.A. 504.