ARCHER-DANIELS-MIDLAND COMPANY, Reidy Terminal, Inc., ADM/Growmark River System, Inc., American River Transportation Co., ADM Milling Co., Collingwood Grain, Inc., Tabor Grain Co., Plaintiffs,

v.

PHOENIX ASSURANCE COMPANY OF NEW YORK, Commonwealth Insurance Company, Navigators Insurance Company, Albany Insurance Company, Hartford Fire Insurance Company, Defendants.

No. 95–CV–4001–JLF.

United States District Court,
S.D. Illinois.

Aug. 4, 1997.

---

Doc. 120, Exhs. 4, 6, 5 and 7, pp. 17–18).

Michael J. Kehart, A. James Shafter, Kehart, Shafter, Decatur, IL, Aubrey M. McDaniel, III, James W. Shannon, Jr., Philip A. Sechler, J. Gordon Seymour, Williams & Connolly, Washington, DC, for Plaintiffs.

Maynerd I. Steinberg, Daniel J. Zollner, Lord, Bissell, Chicago, IL, Carl L. Faveau, Campbell, Black, Carnine & Hedin, Mount Vernon, IL, Eric C. Young, Dunham, Boman, East St. Louis, IL, Harry P. Cohen, Richard M. Appel, Michael Verde, Steven E. Goldman, Kathleen E. Schaaf, Rosenman & Colin, New York City, Donald V. Ferrell, Jelliffe, Ferrell, Harrisburg, IL, Charles M. Fraenkel, Leahy, Eisenberg, Chicago, IL, for Defendants.

### *MEMORANDUM AND ORDER*

FOREMAN, District Judge.

Before the Court is a "Motion for Partial Summary Judgment Under the DIC Policies For Losses Related to Watercraft" filed by defendant Phoenix Assurance Company of New York and Commonwealth Insurance Company pursuant to Federal Rule of Civil Procedure 56 (Doc. 85). Defendants Navigators Insurance Company and Albany Insurance Company have joined in this motion. Archer Daniels Midland Company and its subsidiaries (collectively, "ADM") have filed a response (Doc. 120) and defendants have filed a Reply (Doc. 124). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

### I.  *Introduction.*

For a discussion of the facts leading to this litigation see *Archer–Daniels–Midland Co. v. Phoenix Assur. Co. of New York,* 936 F.Supp. 534, 536 (S.D.Ill.1996).

### II.  *Background.*

Phoenix, Commonwealth, Navigators, and Albany sold ADM Difference In Conditions ("DIC") policies for the period October 1, 1992 to October 1, 1993. These Policies are "excess" insurance policies in that they provide coverage for losses that are in excess of certain amounts ranging from $10 million to $50 million. ADM's primary insurance is with General Accident Insurance Company of North America who is not a party to this lawsuit (Doc. 120, Exh. 2).

ADM claims that the excess DIC policies provide coverage for ADM's "marine expenditures" and "grain degradation" losses. The "marine expenditures" and "grain degradation" claims arose out of ADM's efforts to maintain its transportation operations during the Flood of 1993. When the Mississippi River closed, some of ADM's grain-laden barges were stranded on the river. The "marine expenditures" are the expenses that were incurred to keep the grain cooled and aerated on these barges, as well as the expenses incurred to protect the loaded barges from breaking loose from their moorings (Doc. 120, p. 12). These expenses are also called "sue and labor" expenses. The "grain degradation" claims relate to the actual deterioration of the grain itself. While the barges were stranded, the grain on the barges deteriorated and had to be sold at great discounts to the normal sales price. These discounts gave rise to the "grain degradation" claims. *Id.*

Defendants request a ruling on the following two issues:

A. That the DIC Policies do not cover the Marine Expenditures; and

B. That the DIC Policies do not cover the Cargo, i.e., the Grain Degradation.

### III.  *Interpretation of the Policy.*

Contract interpretation is particularly suited to disposition by summary judgment. *Metalex Corp. v. Uniden Corp. of America,* 863 F.2d 1331 (7th Cir.1988). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. Because neither party has raised the issue of choice of law in this diversity action, the Court will apply the substantive law of Illinois, the forum state. *Travelers Ins. Cos. v. Penda*

*Corp.*, 974 F.2d 823, 827 (7th Cir.1992) (*citing Wood v. Mid–Valley, Inc.*, 942 F.2d 425, 426–27 (7th Cir.1991)).

The construction of an insurance policy and its provisions is a question of law. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992). In construing an insurance policy, the Court's task is to ascertain the intent of the parties to the contract, "with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Id.* (citations omitted). If the policy language is unambiguous, there is no issue of material fact, and the Court must determine the contract's meaning as a matter of law affording the contract language its plain, ordinary, and popular meaning. *Id.* But if the Court determines that the contract is ambiguous, the contract's meaning is a question of fact. *Dash Messenger Serv., Inc. v. Hartford Ins. Co. of Ill.*, 221 Ill.App.3d 1007, 164 Ill.Dec. 313, 316, 582 N.E.2d 1257, 1260 (1st Dist. 1991), *appeal denied*, 143 Ill.2d 637, 167 Ill. Dec. 398, 587 N.E.2d 1013 (1992). A policy provision is ambiguous only if it is subject to more than one reasonable interpretation. *Lapham–Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill.2d 520, 211 Ill.Dec. 459, 463, 655 N.E.2d 842, 846 (1995) (citing *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991)). A policy term is not ambiguous merely because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning. *Id.* (citations omitted).

The parties have agreed that the questions before the Court are clearly questions of policy construction and must be determined by the Court as matters of law. Consequently, the Court must determine the Policies' meaning as a matter of law, affording the contract language its plain, ordinary and popular meaning. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992).

### A. Do the DIC Policies Cover the Marine Expenditures?

Defendants seek a ruling that the DIC Policies do not cover: 1) the sue and labor expenses related to protecting the barges; or 2) the sue and labor expenses related to protecting the grain that was on the barges. These two items are discussed separately below.

#### 1. Sue and Labor Expenses to Protect the Barges.

Defendants seek a ruling that the DIC Policies do not cover the barges themselves or any sue and labor expenses that were incurred to protect the barges. ADM does not dispute that the DIC policies do not insure property damage to the barges. ADM readily concedes that the barges are "watercraft" and that the DIC Policies expressly exclude watercraft from coverage (Doc. 120, p. 12). ADM also notes that the barges were insured by a separate marine insurance policy that was issued by Phoenix.

ADM also does not dispute that the DIC Policies do not cover the sue and labor expenses incurred to protect the barges. What ADM does argue, however, is that the overall sue and labor expenses were incurred not to protect the barges but to protect the grain. As such, ADM argues, the sue and labor expenses are covered by the DIC Policy. Because the parties agree that the DIC Policies do not cover the sue and labor expenses incurred to protect the barges, the Court will not consider this issue further.[1]

#### 2. Sue and Labor Expenses to Protect the Grain.

As noted, ADM argues that its sue and labor expenses were incurred primarily

---

**1.** The parties spend a fair amount of time arguing about whether the sue and labor expenses that ADM incurred were incurred to protect the barges or were to protect the grain. As shown below, the Court finds that the sue and labor expenses are covered only if they were incurred to protect *insured* property. In order to be insured under the DIC Policies, the property must be at a scheduled location. Because the barges and the grain were on inland waterways rather than at scheduled locations, the sue and labor expenses related to those items are not covered by the Policies. Accordingly, whether the sue and labor expenses were incurred to protect the barges or to protect the grain is irrelevant and will not be considered further.

to protect the grain and are therefore covered under the DIC Policy. ADM argues that coverage for these expenses is provided by the DIC Policies' Paragraph 13P.

Paragraph 13P provides that:

13. *ADDITIONAL CONDITIONS*

  P. *SUE AND LABOR*

  IN CASE OF ACTUAL OR IMMINENT LOSS OR DAMAGE BY PERIL INSURED AGAINST, IT SHALL, WITHOUT PREJUDICE THIS INSURANCE, BE LAWFUL AND NECESSARY FOR THE INSURED, ... TO SUE, LABOR, AND TRAVEL FOR, IN, AND ABOUT THE DEFENSE, THE SAFEGUARD, AND THE RECOVERY OF THE PROPERTY OR ANY PART OF THE PROPERTY INSURED HEREUNDER; NOR, IN THE EVENT OF LOSS OR DAMAGE, SHALL THE ACTS OF THE INSURED OR OF THIS COMPANY IN RECOVERING, SAVING AND PRESERVING THE INSURED PROPERTY BE CONSIDERED A WAIVER OR AN ACCEPTANCE OF ABANDONMENT.

(Doc. 120, Exh. 3, p. 26) (emphasis added).[2]

Paragraph 13P states that it provides sue and labor coverage, "in case of actual or imminent damage by a *peril insured against.*" (emphasis added). Paragraph 4 of the Policy designates the perils insured against by stating that:

4. *PERILS INSURED:*

  EXCEPT AS HEREIN EXCLUDED, THIS POLICY INSURES AGAINST ALL RISKS OF DIRECT PHYSICAL LOSS OF OR DAMAGE TO THE PROPERTY INSURED.

(Doc. 120, Exh. 3, p. 3).[3]

"Property insured" is listed in Paragraph 5 which states that:

5. *INTERESTS AND PROPERTY COVERED:*

  EXCEPT AS HEREIN EXCLUDED, THIS POLICY COVERS *AT SCHEDULED LOCATIONS* ON FILE WITH THE COMPANY; ...

  A. THE INTEREST OF THE INSURED IN ALL REAL PROPERTY, INCLUDING MACHINERY, EQUIPMENT AND SUPPLIES USED FOR THE SERVICE OF THE BUILDING ... WHEN ON SUCH PREMISES OR WITHIN 500 FEET THEREOF;

  B. THE INTEREST OF THE INSURED IN PERSONAL PROPERTY OWNED BY THE INSURED;

  C. THIS POLICY SHALL ALSO COVER WHILE IN THE CUSTODY OF THE INSURED ON THE DESCRIBED PREMISES OR IN THE OPEN WITHIN 1000 FEET THEREOF;

  (1) PERSONAL PROPERTY OF OTHERS WHICH THE INSURED IS UNDER OBLIGATION TO KEEP INSURED;

  (2) THE INTEREST OF THE INSURED IN A LEGAL LIABILITY FOR LOSS OR DAMAGE BY ANY OF THE PERILS HEREIN INSURED AGAINST ...

(Doc. 120, Exh. 3, p. 4) (emphasis added).[4]

Based on the plain language of Paragraph 13P, the DIC Policies provide sue and labor coverage only for the "property insured." The plain language of Paragraph 5 states that to be insured under the Policy the property must be at a scheduled location. The barges and the grain that were stalled on the River were on inland waterways rather than at scheduled locations. ADM does not contest the fact that the barges were not at scheduled locations. Accordingly, Paragraph 13P of the DIC Policies does not provide

**2.** The Policies from Commonwealth, Navigators and Albany contain identical language. (See Doc. 120, Exhs. 4, 6, 5 and 7, p. 26).

**3.** The Policies from Commonwealth, Navigators and Albany contain identical language. (See Doc. 120, Exhs. 4, 6, 5, and 7, p. 3).

**4.** The Policies from Commonwealth, Navigators and Albany contain identical language. (See Doc. 120, Exhs. 4, 6, 5, and 7, pp. 4–5).

coverage for the sue and labor expenses that were incurred to protect either the barges or the grain that was on the barges while the barges were stalled on the River.

ADM does argue, however, that Paragraph 5's requirement that the property be at scheduled locations does not apply to Subsection B of Paragraph 5. Specifically, ADM argues that while the lead-in of Paragraph 5 refers to "scheduled locations," that restriction is not contained in Subsection B. ADM further argues that Subsection B, unlike Subsections A and C, does not restrict its coverage in terms of the property's vicinity to an insured location, (e.g., § 5.A ("when on such premises or within 500 feet thereof")); § 5.C ("while ... on the described premises or in the open within 1000 feet thereof."). Thus, according to ADM, the property insured in § 5.B is not restricted to property located at scheduled locations.

As aptly noted by defendants, ADM's argument is a tortuous attempt to avoid Paragraph 5's scheduled location requirement. Subsection B plainly requires the antecedent "lead-in" language to render it meaningful. Subsection B which reads in full, "the interest of the insured in personal property owned by the insured," cannot stand alone. Moreover, Subsections A and C, rather than "restricting" coverage, as ADM contends, serve to *extend* coverage to locations within 500 feet and 1000 feet of the scheduled locations, respectively. ADM's position is entirely illogical and wholly at odds with the plain meaning of the language of Paragraph 5, Subsection A. In interpreting an unambiguous contract, the Court must determine the contracts' meaning as a matter of law, affording the language its plain, ordinary and popular meaning. *Outboard Marine Corp.*, 180 Ill.Dec. at 699, 607 N.E.2d at 1212. As noted, Paragraph 13P of the DIC Policies does not provide coverage for the sue and labor expenses that were incurred to protect either the barges or the grain that was on the barges while the barges were stalled on the River.

### B. *Do the DIC Policies Cover the Cargo?*

Defendants seek a ruling that the DIC Policies do not cover the grain cargo that was being transported on the barges. As noted, the grain that was on the barges was not at a scheduled location as required by Paragraph 5 and is therefore not covered by the DIC Policies.

ADM argues, however, that it purchased a "transportation form" with its DIC coverage to expressly cover its property in transit. Specifically, ADM argues that this transportation form is an addendum to its primary DIC policy with General Accident Insurance Company of North America. This form does not require property to be at scheduled locations to be covered because the form simply states that it insures "personal property owned by the insured" from "all risks or direct physical loss of or damage to the insured property from any external cause ..." (Doc. 120, pp. 24, 27). Thus, ADM argues, the transportation form covers ADM's grain degradation claims.

■ ADM may be correct that the transportation form covers ADM's grain degradation claims under the *primary* DIC policy. ADM has not shown, however, that the mere attachment of this transportation form to the primary policy has any effect whatsoever on the coverage provided by the excess DIC Policies.

■ Primary insurance is coverage where "under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability." *Whitehead v. Fleet Towing Co.*, 110 Ill. App.3d 759, 66 Ill.Dec. 449, 453, 442 N.E.2d 1362, 1366 (5th Dist.1982). A primary policy provides "first dollar" liability coverage up to the limits of the policy, and in some instances subject to a deductible. An "excess" or secondary insurance policy provides coverage where "under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." *Whitehead*, 66 Ill.Dec. at 453, 442 N.E.2d at 1366. Excess insurance is the next "layer" of coverage above the primary policy.

The primary insurer and the insured have a contractual relationship. Michael M. Marick, *Excess Insurance: An Overview of General Principles and Current Issues*, 24 Tort

& Ins. L.J. 715, 717 (1989). There is also a contractual relationship between the excess insurer and the insured. *Id.* There is no contractual relationship, however, between a primary insurer and an excess insurer. *Id.* Rather, the relationship between the excess insurer and its insured is defined principally by their insurance contract. *Id.* at 719.

■ The rights and obligations of both the insured and the excess carrier must be determined pursuant to the policy to which they are parties. *Id.* at 719. To the extent that an excess policy incorporates the terms of an underlying policy, however, those provisions will govern the parties' rights under the excess policy. *Id.* In fact, excess policies often provide coverage for the exact same risks that are covered by the underlying insurance policy. This type of excess policy is called a "following form" policy. A typical following form excess indemnity clause provides that:

> The provisions of the immediate underlying policy are incorporated as part of this policy except for any obligation to investigate and defend and pay for costs and expenses incident to any of the same, the amounts of the limits of liability, any "other insurance" provision and any other provisions therein which are inconsistent with this policy.

*Id.* at 718.

■ The excess Policies at issue here do not contain language that is even remotely similar to the above following form language. In contrast, the excess Policies contain language that plainly compels the opposite result. Specifically, these Policies state that:

3. *LIABILITY DETERMINATION*

IN DETERMINING THE·AMOUNT OF ANY ONE LOSS, DISASTER, OR CASUALTY FOR WHICH THIS POLICY IS EXCESS, THE TOTAL LOSS FOR ALL COVERAGES CAUSED BY ANY COMBINATION OF PERILS, ONE OR MORE OF WHICH IS INSURED AGAINST UNDER THE PRIMARY POLICY, SHALL BE USED EVEN THOUGH ALL SUCH PERILS OR COVERAGES ARE NOT INSURED AGAINST UNDER THIS EXCESS POLICY.

A. ANY RECOVERIES MADE UNDER THE PRIMARY POLICY SHALL BE CONSIDERED AS FIRST APPLYING TO THOSE PERILS AND/OR COVERAGES NOT INSURED AGAINST BY THIS POLICY. UPON EXHAUSTION OF THE PRIMARY POLICY LIMITS, THIS POLICY SHALL DROP DOWN AND BE LIABLE FOR THE LOSS IN EXCESS OF THE AMOUNT ATTRIBUTED TO THE PRIMARY POLICY AS RESPECTS THOSE PERILS AND/OR COVERAGES *INSURED HEREUNDER* SUBJECT TO THE LIMIT OF THIS POLICY.

(Doc. 120., Exh. 3, p. 2) (emphasis added.) [5]

The first paragraph of Paragraph 3 recognizes that some perils or coverages may be insured against under the primary policy but not by the excess Policies. Specifically, Paragraph 3 states that, "the total loss for all coverages ... one or more of which is insured against under the primary policy, shall be used even though all such perils or coverages are not insured against under this excess policy." (Doc. 120, Exh. 3, p. 2). Paragraph 3, Subsection A, then goes on to state that after the primary policy limits are exhausted, the excess coverage shall drop down and be liable for the loss in excess of the amount attributed to the primary policy as respects those perils and/or coverages *insured hereunder.* In other words, when the primary policy limits are exhausted, the excess policy shall provide coverage within the primary policy dollar coverage range, but

---

5. The Policies from Commonwealth, Navigators and Albany contain identical language. (See Doc. 120, Exhs. 4, 6, 5, and 7, p. 2).

Paragraph 3, Subsection A refers to "drop down" coverage. "Drop down" coverage within the meaning of an excess policy requires the excess insurer to indemnify the insured for losses which otherwise would be covered by the underlying primary insurer but for the primary insurer's lack of payment, typically due to the primary insurer's insolvency. *Hartford Acc. & Indem. Co. v. Chicago Housing Auth.,* 12 F.3d 92, 95 (7th Cir.1993).

only for the losses expressly insured by the excess policy itself.[6]

As noted above, the rights and obligations of the insured and the excess carriers are determined according to the Policy to which they are parties. Contrary to what ADM might wish to infer, the transportation form attached to General Accident's primary policy has no effect whatsoever on the coverage provided by the excess Policies issued by Phoenix, Navigators', Commonwealth and Albany. Also as noted above, there is no contractual relationship between the primary and excess insurers. Each has a separate contractual obligation to the insured. Because the carriers are not in privity with one another, it has been suggested that the primary and excess carriers "are not blood relatives but are at best 'in-laws.'" *Conley, Relations Between Primary and Excess Insurance Carriers,* Fed.Ins.Couns.Q. 123, 124 (Wtr.1982). Accordingly, the coverage provided by the excess DIC Policies is unaffected by the transportation form attached to the primary policy. As discussed in Section III.A.2 above, the grain cargo was not at scheduled locations while on the stalled barges. Therefore, based on the Policies' plain language, the grain cargo is not property insured under the excess DIC Policies.

Even if the grain cargo were somehow deemed to be property insured under the excess DIC Policies, ADM's grain degradation claims are specifically excluded under the DIC Policies. The excess DIC Policies exclude losses caused by "inherent vice" or "changes in humidity, ... or extremes of temperature, change in flavor, color, ...". (Doc. 120, Exh. 3., p. 9). Specifically, Paragraph 6 provides that:

6. *PERILS EXCLUDED:*

THIS POLICY DOES NOT INSURE AGAINST LOSS OR DAMAGE CAUSED BY OR RESULTING FROM:

K. INHERENT VICE, INSECTS, VERMIN, SMOG ...

L. CHANGES IN RELATIVE HUMIDITY, CHANGES OR EXTREMES OF TEMPERATURE, CHANGE IN FLAVOR, COLOR, ...

(Doc. 120, Exh. 3, p. 9).[7]

"Inherent vice" is defined as "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." *Vana Trading Co., Inc. v. S.S. "Mette Skou",* 556 F.2d 100, 104 (2d Cir.1977). ADM does not dispute that the inherent nature of grain is to deteriorate or degrade with the passage of time. ADM does argue, however, that because the proximate cause of the loss was an insured peril, (the Flood), and not the inherent tendency of the grain to deteriorate, the inherent vice exclusion does not apply.

ADM's proximate cause argument has muddied the waters but can fortunately be avoided by the plain language of the excess DIC Policies. Paragraph 6 is the "Perils Excluded" section of the Policies. Paragraph 6 contains twenty different types of perils that are expressly excluded (Doc. 120, Exh. 3, pp. 6–9). Where one of these excluded perils is somehow limited, or requires the kind of "causation" analysis suggested by ADM, the DIC policies say so in express terms. For example Paragraph 6.R states that the excess DIC policies do not cover loss or damage caused by an interruption of power unless it is the result of physical damage to insured property "from a peril insured." (Doc. 120, Exh. 3, p. 9). Other examples may be found in Paragraphs 6.C, 6.F, 6.I, 6.T. Had the parties intended the excess DIC Policies to cover inherent vice where a peril insured had somehow contributed to the manifestation of such inherent vice, the poli-

---

**6.** Although none of the parties have argued about any of the provisions of Paragraph 3, Subparagraphs 3.B and 3.C contain identical language limiting the excess coverage to those perils *"covered hereunder"* (Doc. 120, Exh. 3, p. 3) (emphasis added). Similarly, Subparagraph 3.D states that when the underlying limits are diminished or exhausted the *"coverage herein"* shall respond ... (Doc. 120, Exh. 3, p. 3) (emphasis added).

Again, the excess Policies from Commonwealth, Navigators and Albany contain identical language. (See Doc. 120, Exhs. 4, 6, 5, and 7, pp. 2–3).

**7.** The Policies from Commonwealth, Navigators and Albany contain identical language. (See Doc. 120, Exhs. 4, 6, 5, and 7, p. 9).

cy language would have been so drafted. This Court "will not add terms to the contract of insurance which the parties have not included in the language of the policy." *Archer–Daniels–Midland Co. v. Phoenix Assur. Co. of New York,* 936 F.Supp. 534, 538 (S.D.Ill.1996) (citations omitted). Accordingly, even if the grain cargo were somehow deemed to be property insured under the excess DIC Policies, ADM's grain degradation claims are specifically excluded under Paragraphs 6.K and 6.L of the excess DIC Policies.[8]

## IV. *Summary.*

The Court finds that the language of the DIC Policies relevant to the issues before the Court is unambiguous. The Court further finds that the DIC Policies provide no coverage for property damage to the barges or sue and labor expenses incurred to protect the barges, nor do they provide coverage for the cargo that was being transported on the barges. Accordingly, defendants' Motion for Partial Summary Judgment Under the DIC Policies For Losses Related to Watercraft (Doc. No. 85) is **GRANTED.**

**IT IS SO ORDERED.**

---

8. ADM supports its proximate cause argument with three cases. The first is *Lanasa Fruit v. Universal Ins. Co.,* 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422 (1938). *Lanasa Fruit* is distinguishable first because it involved a marine policy which was specifically written to cover property in maritime transit rather than a DIC Policy which is written to cover only property that is at scheduled locations. Second, contrary to ADM's assertions, *Lanasa Fruit* merely suggests that losses caused by delay are covered *if* the delay was caused by an insured peril. *Lanasa Fruit* did not involve an inherent vice exclusion clause like the one at issue and is therefore inapplicable. ADM's second two cases, *Perzy v. Intercargo Corp.,* 827 F.Supp. 1365 (N.D.Ill.1993) and *Nationwide Brokers, Inc. v. C & G Trucking Corp.,* 1988 WL 116827 (N.D.Ill. Oct. 21, 1988), deal with snowball paperweights and Soap Opera Digest magazines, respectively. Unlike grain, the inherent nature of these items does not cause them to deteriorate with the mere lapse of time and therefore the cases are distinguishable on that basis.