[No. 49640-9-I. Division One. May 28, 2002.]

THE PORT OF SEATTLE, *Appellant*, v. LEXINGTON INSURANCE COMPANY, ET AL., *Respondents*.

902

904

*Dale L. Kingman, James E. Horne,* and *Michael E. Ricketts* (of *Peery, Hiscock, Pierson, Kingman & Peabody, P.S.*), for appellant.

*Jerrett E. Sale* and *Deborah L. Carstens* (of *Bullivant Houser Bailey*); *Michael K. McCormack; Thomas M. Jones* and *Janice Sue Wong* (of *Cozen and O'Connor*); and *Terrence L. Fredrickson* (of *Leary, Franke & Droppert, P.L.L.C.*) (*Douglas G. Houser* of *Bullivant Houser Bailey; Alan R. Miller* of *Robins Kaplan Miller & Ciresi, L.L.P; Richard C. Bennett* of *Cozen and O'Connor;* and *Kenneth W. Erickson* of *Ropes & Gray*, of counsel), for respondents.

AGID, J. — The Port of Seattle (Port) appeals from two orders dismissing its action to recover insurance proceeds against its 1997 and 1998 insurers for the expenses it incurred upgrading its computer systems to avoid Year 2000 (Y2K) date recognition problems at the turn of the century. At issue is whether the Port timely filed its suit and whether the policies under which it sued covered its Y2K-related expenses. Because the Port's Y2K problem did not constitute a "computer virus," we affirm the trial court's order. We also hold that despite the Port's fortuitous loss and timely suit, the sue and labor provision does not provide coverage and the inherent vice exclusion precludes it.

## FACTS

In the early to mid-1990s, the Port of Seattle began working on making its computer systems Y2K compliant. Although it took some measures at that time, its efforts did not begin in earnest until 1997. And it was not until testing and assessment of its systems in 1998 that the Port discovered it would incur losses on or after January 1, 2000.

In December 1998, the Port filed claims with several insurers with which it had policies in effect during that year (1998 insurers), seeking reimbursement for its upgrade expenses. In November 1999, it provided notice of claims to insurers that provided coverage during 1997 (1997 insurers). The 1998 insurers issued policies to the Port in effect from January 1, 1998, to January 1, 1999. The provisions of the 1998 agreements are identical in their pertinent provisions to those in the 1997 policies, with the exception that the term of the 1997 policies is January 1, 1997, to January 1, 1998.

In November 1999, the Port brought suit against both groups of insurers. In June 2000, the 1997 insurers moved for judgment on the pleadings, arguing that the Port's suit was untimely because it was not brought within the 12-month suit limitation period allegedly incorporated in the policies. The trial court granted the motion, and the Port then filed a motion for reconsideration. The trial court denied the motion.

In September 2000, the 1998 insurers moved for summary judgment, asserting not only the same 12-month suit limitation position, but also arguing that the Port sustained no covered loss during the policy period, the known loss/risk doctrine and the inherent vice exclusion precluded coverage, and the sue and labor provision did not provide coverage. The trial court granted the motion and denied the Port's motion for partial summary judgment on the 1998 policies. The Port timely appeals the trial court's orders dismissing its claims.

## DISCUSSION

### Standards of Review

■ ■ The Port's action against its 1997 insurers was dismissed on their motion for judgment on the pleadings. We review rulings granting a motion to dismiss under CR 12(b)(6) de novo. Dismissal is appropriate only if " 'it appears beyond a reasonable doubt that no facts exist that would justify recovery.' "[1] We accept as true the allegations in a plaintiff's complaint and any reasonable inferences therein.[2]

■ The Port's suit against the 1998 insurers was dismissed under CR 56(c). Summary judgment is proper when there is no genuine issue about any material fact and the moving party is entitled to judgment as a matter of law.[3] This court conducts the same inquiry as the trial court in reviewing a summary judgment order.[4] We review summary judgment orders de novo,[5] and view all evidence in the light most favorable to the nonmoving party.[6]

### "Computer Virus"

The Port seeks coverage for "loss of computer resources" due to a "computer virus" under the insurance agreements' "Data Processing Media" inclusion provisions.[7] The

---

[1] *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998) (quoting *Cutler v. Phillips Petroleum Co.*, 124 Wn.2d 749, 755, 881 P.2d 216 (1994), *cert. denied*, 515 U.S. 1169 (1995)).

[2] *Id.*

[3] CR 56(c).

[4] *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92, 993 P.2d 259 (2000).

[5] *Id.*

[6] *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990).

[7] The policy provides in pertinent part:

H. Data Processing Media

 1. Property Insured: Active data processing media, being property of the insured or property of others for which the insured may be liable.

insurers maintain that the Port's Y2K-related expenses are not covered because its Y2K problem did not constitute a "computer virus" and it did not suffer a "loss of computer resources." They also argue that the policies' inherent vice exclusion provision precludes coverage because the Port's Y2K problem was an internal, not external, cause of its losses. We hold that the Port's Y2K problem was not a computer virus because it was not able to replicate itself and it could not infect other programs by modifying them to include a version of itself.

■ ■ The policies do not define the term "computer virus." Undefined terms in an insurance contract must be given their plain, ordinary, and popular meaning.[8] To determine the plain meaning of an undefined term, we look to standard English dictionaries.[9] The language of insurance contracts is to be interpreted in accordance with the way it would be understood by the average person rather than in a technical sense.[10]

■ The interpretation of an insurance policy is a question of law, and summary judgment is appropriate if the contract has only one reasonable meaning when viewed in the light of the parties' objective manifestations.[11] Insurance policies are to be construed as a whole, with force and

----

 . . . .

4. Perils Insured: This agreement insures against all risks of direct physical loss or damage to the property covered except as hereinafter provided. *Coverage is specifically extended for a loss due to computer virus including loss of data and extra expense even if no direct damage has occurred to equipment, media or data.*

 . . . .

7. Definitions: The term "active" data processing media, whenever used in this contract, shall mean all forms of converted data and/or programs and/or instruction vehicles employed in the insured's data processing operations. *Virus loss is defined to include direct physical loss, loss of computer resources, loss of data and corruption of data.*

(Emphasis added.)

[8] *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990).

[9] *Id.*

[10] *Id.* at 881.

[11] *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 9, 937 P.2d 1143 (1997).

effect given to each clause.[12] "Overall, a policy should be given a practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective."[13] An inclusionary clause in an insurance contract should be liberally construed to provide coverage whenever possible.[14] Exclusionary clauses are to be construed strictly against the insurer.[15]

The insurers cite multiple consistent definitions of the term "computer virus." In general, their definitions define computer virus as "a computer program usu. hidden within another seemingly innocuous program that produces copies of itself and inserts them into other programs and that usu. performs a malicious action."[16] The key feature of the definitions the insurers urge is that the virus be self-replicating. The Port does not define the term computer virus. Rather, it provides a definition for the term "virus," asserting that it is "the causative agent of an infectious disease."[17] It argues that under its definition there is no requirement that a virus be self-replicating.

The Port defines biological viruses, not those related to computers. A computer system cannot suffer from a physical virus. And even under the Port's definition, the virus must be transferable. Its Y2K programming problem, however, was merely the result of an original programming decision. It was not infected by anything external nor was it

---

[12] *Am. Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993), *supplemented by* 123 Wn.2d 131 (1994).

[13] *Transcon. Ins. Co. v. Wash. Pub. Utils. Dists'. Util. Sys.*, 111 Wn.2d 452, 457, 760 P.2d 337 (1988) (citing *Morgan v. Prudential Ins. Co. of Am.*, 86 Wn.2d 432, 434-35, 545 P.2d 1193 (1976)).

[14] *Mercer Place Condo. Ass'n v. State Farm Fire & Cas. Co.*, 104 Wn. App. 597, 602, 17 P.3d 626 (2000), *review denied*, 143 Wn.2d 1023 (2001).

[15] *Id.* at 603.

[16] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1316 (10th ed. 2001); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 380 (4th ed. 2000) (defining computer virus as "[a] computer program that is designed to replicate itself by copying itself into the other programs stored in a computer").

[17] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2556 (1993).

communicable. The Port, nevertheless, briefly asserts that its Y2K problem was self-replicating when, "[f]or example, if a microprocessor-controlled sprinkler system is connected to a fire alarm, the failure of the sprinkler system to activate may, in turn, affect activation of the fire alarm." This example is not persuasive. It illustrates a potential Y2K-caused problem, not a self-replicating computer program.

The Port also contends that deliberate encoding of a two-digit year field is a computer virus. We disagree. The two-digit year code is contained within a specific computer program or system and does not replicate itself to other computers or systems.[18] The Port's Y2K problem was the result of a deliberate decision by programmers to use a two-digit rather than four-digit year field. This feature does not cause the software to be infectious. There is no evidence that the Port's Y2K problem was anything other than original programming. We therefore conclude that the agreements do not permit the Port to recover for its Y2K-related expenses because its Y2K problem was not a computer virus. Consequently, we need not decide whether it suffered a "loss of computer resources, loss of data and corruption of data."

### Inherent Vice

■■■ An inherent vice is defined by various courts as " 'any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time.' "[19] It is also defined "as a cause of loss

---

[18] See JEFF JINNETT, *Legal Issues Concerning the Year 2000 Computer Problem,* in UNDERSTANDING, PREVENTING AND LITIGATING YEAR 2000 ISSUES: WHAT EVERY LAWYER NEEDS TO KNOW NOW 103, 109 (PUB. LAW INST. 1998); Bruce W. Foudree, *The Year 2000 Problem and the Courts,* 9 KAN. J.L. & PUB. POL'Y 515 (2000); FREDERICK COHEN, A SHORT COURSE ON COMPUTER VIRUSES 2 (John Wiley & Sons 2d ed. 1994); ROBERT SLADE'S GUIDE TO COMPUTER VIRUSES 450 (Springer Verlag 1994).

[19] *Mo. Pac. R.R. v. Elmore & Stahl,* 377 U.S. 134, 136, 84 S. Ct. 1142, 12 L. Ed. 2d 194 (1964) (quoting jury instruction); *Vana Trading Co. v. S.S. "Mette Skou",* 556 F.2d 100, 104 (2d Cir.), *cert. denied,* 434 U.S. 892 (1977); *Archer-Daniels-*

not covered by the policy, [which] does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction. The vice must be inherent in the property for which recovery is sought."[20] The inherent vice exclusion clause here provides:

> This insuring agreement does not insure against loss caused by the following, unless loss by a peril not otherwise excluded ensues, and then this company shall be liable only for such ensuing loss:
>
> c. Inherent vice, wear, tear, gradual deterioration or depreciation.

 The insurers maintain that the inherent vice exclusion precludes coverage for the Port's claimed losses because the Y2K two-digit date field code is an internal, as opposed to external, cause. The Port contends that the peril is external, stating:

> There is no "vice" about a two-digit date field code. It doesn't destroy itself. Rather, the problem is the effect the two-digit date field code will have on the ability to use computer resources, and the attendant loss of data or corruption of data (all covered perils), in the event the date field code is not remediated.[21]

It further asserts that "[a]bsent an external event, *i.e.*, date transition, Y2K would not have been a problem." We do not agree.

In *State Farm Fire & Casualty Co. v. Volding*,[22] the insurance policy excluded losses caused by inherent vices. The plaintiffs claimed damage to their dwelling because rain water entered the pores of some of the bricks in the chimney and two adjoining walls of their home. When it

---

*Midland Co. v. Phoenix Assurance Co.*, 975 F. Supp. 1129, 1136 (S.D. Ill. 1997); *United States Steel Int'l, Inc. v. Granheim*, 540 F. Supp. 1326, 1329-30 (S.D.N.Y. 1982).

[20] *Employers Cas. Co. v. Holm*, 393 S.W.2d 363, 367 (Tex. App. 1965).

[21] (Footnote omitted.)

[22] 426 S.W.2d 907 (Tex. App. 1968).

froze, portions of those bricks became detached, cracked, collapsed, and crumbled. The bricks damaged by freezing were not suitable for use in outside walls or other structures exposed to the weather. The bricks' porous condition was an inherent vice which made them unsuitable for use in areas not protected from the weather, and accordingly, the court held that the actual cause of the loss was an excludable inherent vice.

The Port attempts to cast the loss as external by arguing that absent an external event, date transition, Y2K would not have posed a problem. This contention is without merit. Under the Port's reasoning, the defective bricks in *Volding* would not be considered an inherent vice because it was the external freezing that caused the problem. But for the defective bricks, the freezing rain water would not have caused the damage. Likewise, but for the two-digit date field code programmed into the Port's software, the arrival of January 1, 2000, would not result in loss. Thus, the Port's Y2K problem is an excluded inherent vice because the date field is an internal quality that brought about its own problem.

The Port next argues that if the inherent vice exclusion applies, its losses are covered as an ensuing loss. The ensuing loss exception to the inherent vice exclusion says that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered. The uncovered event itself, however, is never covered. Here, the Port's argument fails because the only peril here is the excluded Y2K problem.

In *Aetna Casualty & Surety Co. v. Yates*,[23] the plaintiffs discovered that the joists, sills and subflooring of their home were almost rotted away because the crawl space under the house had inadequate venting. Contact between air trapped in the crawl space and subfloors and sills, which had been chilled by air conditioning, produced condensation and consequent rotting. Their policy excluded loss caused

---

[23] 344 F.2d 939 (5th Cir. 1965).

by inherent vice, deterioration, rot, mould, or other fungi, and dampness of atmosphere, but it excepted from the exclusion ensuing loss caused by water damage. The plaintiffs argued that since the loss was caused by condensation of moist air into water and was not within another exclusionary clause, that the ensuing loss exception permitted coverage. The court disagreed and stated:

> We do not think that a single phenomenon that is clearly an excluded risk under the policy was meant to become compensable because in a philosophical sense it can also be classified as water damage; it would not be easy to find a case of rot or dampness of atmosphere not equally subject to that label and the exclusions would become practically meaningless. In our case the rot may have ensued from water but not from water damage, and the damage ensuing from the rot was not the damage from the direct intrusion of water conveyed by the phrase "water damage."[24]

In *Vermont Electric Power Co. v. Hartford Steam Boiler Inspection & Insurance Co.*,[25] the insurance policy excluded from coverage losses from "defective design," but exempted any ensuing losses not already excluded. The loss was damage to the insured's transformers caused by a design defect. The court held that the loss was not the design defect, but the damage to the transformers; the defective design was the cause. "An ensuing loss would be one which occurred subsequent to the overheating of the transformers, for example, fire destruction of the building which housed the transformers."[26] This case presents precisely the type of situation in which the loss is directly related to the original excluded risk. Thus, the design defect alone was not the initial loss from which the damage to the transformers ensued. If the damage to the transformers is considered an ensuing loss, then the exception swallows the exclusion.

---

[24] *Id.* at 941.

[25] 72 F. Supp. 2d 441 (D. Vt. 1999).

[26] *Id.* at 445.

The Port, like the plaintiffs in *Aetna Casualty* and *Vermont Electric*, attempts to paint its losses as something other than an excluded loss. The only peril suffered by the Port, however, was the excluded inherent vice. For it to claim that its losses during testing and assessment constitute a separate, covered peril would render the inherent vice exclusion meaningless. We conclude that the inability of the Port's noncompliant software to distinguish between the years 1900 and 2000 is a vice inherent in its computer system. Thus, coverage is precluded by the inherent vice exclusion.

## Sue and Labor

■ A sue and labor clause is a contract provision that addresses the mutual duties owed by an insured and an insurer. It allows reimbursement to the insured for expenses it incurs to prevent or mitigate a covered loss.[27] Since the clause is to reimburse the insured for expenses incurred in satisfying the insured's duty to the underwriter, there is no such duty where the policy does not apply.[28] The obligation exists only when the action taken is to prevent a loss for which the underwriter would be liable.[29] The sue and labor clause here provides in part that in the case of "actual or imminent loss or damage by a peril insured against," the Port may take any action to safeguard the property, and if it does so, the insurers will contribute to the expenses incurred.[30]

---

[27] *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 488-89 (5th Cir. 1960).

[28] *Id.*

[29] *Id.*

[30] The sue and labor clause provides in full:

In case of actual or imminent loss or damage by a peril insured against, it shall, without prejudice to this insurance, be lawful and necessary for the Insured, their factors, servants, or assigns to sue, labor and travel for, in and about the defense, the safeguard and the recovery of the property or any part of the property Insured hereunder. Acts of the Insured or of the Company in recovering, saving, and preserving the Insured property shall not be considered a waiver or an acceptance of abandonment. The Company shall contribute to the

The insurers argue that this provision does not apply because it is triggered only when measures are taken to prevent loss from occurring *during* the policy period. Because the Port's actions were directed at preventing losses that it anticipated would occur on or after January 1, 2000, the clause necessarily did not apply. The Port claims that the insurers' understanding of the provision is erroneous because, it argues, their interpretation adds the requirement that the covered loss be during the policy period. It also contends that the provision applies because, by repairing, replacing, reproducing, reprogramming, and remediating data processing equipment in 1998, it experienced a covered "loss of computer resources" before 2000.

In *Wolstein v. Yorkshire Insurance Co.*,[31] the insured sought to recover for expenses after his boat builder abandoned construction and declared bankruptcy. The boat builder shut its doors on November 30, 1990, and the insurance contract affording sue and labor coverage was terminated two weeks later. Once the insured learned of the abandonment, he obtained security and utilities to protect the vessel. This court held that there was no coverage for any expenses incurred after the policy terminated because they could not prevent a loss for which the insurer would be liable. The *Wolstein* court stated:

> Once the policy expired, the underwriters were no longer liable for any new losses, and whatever action Wolstein took after coverage lapsed could not affect the underwriters' liability one way or the other. Since the underwriters, in this case, were no longer liable for new losses once the policy lapsed and no covered peril had actually occurred, they received no benefit from Wolstein's mitigating actions taken after December 13, 1990. It would be contrary to the purpose of the sue and labor provision to continue to hold the underwriters liable for Wolstein's security and utility expenses incurred after the

---

expenses so incurred according to the rate and quantity of the sum herein insured.

[31] 97 Wn. App. 201, 985 P.2d 400 (1999).

policy expired because the underwriters were not liable for any losses that occurred after coverage lapsed.[32]

As we held in *Wolstein*, a sue and labor provision covers only losses that will occur during the policy period. The same rationale precludes coverage here because the loss the Port's remediation efforts were designed to prevent would have occurred after the policies lapsed. As the Port's chief technical officer, William Swedish, stated, the remediation program was to prevent the systems from becoming unusable *after* January 1, 2000.

The Port argues the covered loss was the problems it encountered during assessment. But that argument is tautological because the purpose of the sue and labor provision is to prevent or mitigate a *covered* loss. The covered loss cannot be both the losses that transpire during the prevention measures as well as the future loss the insured is trying to prevent.

The insurers did not have a duty to reimburse the Port for expenses spent to prevent a loss for which the insurers would not be liable. Because the Port sought to prevent losses that would occur on or after January 1, 2000, after the policies expired, there was no covered loss. And as we held above, the Port did not sustain a covered loss because no loss was caused by a computer virus.[33] We therefore conclude that the sue and labor provision does not provide coverage.

## Timely Suit

■■■ Common to both sets of insurers is the question whether the Port's suit was untimely under the 12-month suit limitation of the 1943 New York Standard Fire Insurance Policy, also known as the "165-line" fire insurance form (standard form). Under the standard form, no suit for the recovery on any claim under a property insurance policy

---

[32] *Id.* at 219.

[33] As counsel acknowledged at oral argument, the sue and labor provision applies only where the insured takes measures to prevent or mitigate a covered loss.

may be maintained unless it is brought within 12 months of the inception of loss.[34] The Port does not deny that its suit would be barred if the 12-month limitation applies. The policies here, however, do not incorporate the standard policy. Rather, section 32 provides:

> No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this policy. The Company agrees that any action or proceedings against it for recovery of any loss under this policy shall not be barred if commenced within the time prescribed therefore in the statutes of the State of Washington.

The insurers maintain that the policies incorporated the standard form because the Port allegedly admitted this fact in its complaint. Based on this admission, the insurers claim that the Port's suit is barred as untimely under *Graingrowers Warehouse Co. v. Central National Insurance Co.*[35] The insurers also argue that even if the admission does not incorporate the standard form, the 12-month limitation is incorporated under RCW 48.18.200(1)(c),[36] RCW 48.18.120(1),[37] and WAC 248-20-010.[38] In *Schwindt v.*

---

[34] The standard form here provides:

> No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twelve months next after inception of the loss.

[35] 711 F. Supp. 1040 (E.D. Wash. 1989).

[36] RCW 48.18.200(1)(c) prohibits suit limitations clauses in insurance policies that limit a right of action against an insurer to a period of less than one year from the time when the cause of action accrues in connection with all insurances other than property and marine and transportation insurances. In contracts of property insurance, or of marine and transportation insurance, such limitation shall not be to a period of less than one year from the date of the loss.

[37] RCW 48.18.120(1) authorizes the insurance commissioner to promulgate regulations as necessary to "effect reasonable uniformity in all basic contracts of fire insurance."

[38] WAC 284-20-010(3), promulgated under RCW 48.18.120(1), provides in pertinent part:

> Except for the provisions of the next succeeding three paragraphs, no company shall issue any basic contract of fire insurance covering property or interest therein in this state other than on the form known as the 1943 New York

*Commonwealth Insurance Co.*,[39] our Supreme Court rejected both of the insurers' contentions. Citing *Schwindt* and *Panorama Village Condominium Owners Association Board of Directors v. Allstate Insurance Co.*,[40] the Port contends that its policies do not incorporate the standard form, and therefore the six-year statute of limitations for written contracts[41] applies. We agree.

In *Schwindt*, our Supreme Court held that the six-year statute of limitations for written contracts applied, rather than the 12-month standard form limitation, where the policy did not contain a one-year limitation provision. The *Schwindt* court rejected Commonwealth's reliance on *Simms v. Allstate Insurance Co.*,[42] because the policy in *Simms* contained an express 12-month suit limitation provision. The *Schwindt* court also stated that

> [a] fire policy that does not include a suit limitations provision is more favorable to the insured than the "standard fire policy" and, thus, the absence of such a provision in the policy here does not violate WAC 284-20-010(3).[43]

"Subparagraph (c) of WAC 284-20-010(3) . . . permits an alternative form that provides 'terms, conditions and coverages *not less favorable to the insured* than the "standard fire policy." ' "[44] Thus, RCW 48.18.200 and WAC 248-20-010 do not mandate a 12-month limitation period. They merely provide that no contract limitation provision may be less than 12 months.

The insurers rely on *Graingrowers*. There, the district court for the Eastern District of Washington, applying

---

Standard Fire Insurance Policy, herein referred to as the "standard fire policy"[.]

[39] 140 Wn.2d 348, 997 P.2d 353 (2000).

[40] 144 Wn.2d 130, 26 P.3d 910 (2001).

[41] RCW 4.16.040.

[42] 27 Wn. App. 872, 873, 621 P.2d 155 (1980).

[43] *Schwindt*, 140 Wn.2d at 355 (emphasis omitted).

[44] *Id.* at 355 n.6 (quoting WAC 284-20-010(3)(c)).

Washington law, enforced a suit limitation provision that required suits to be filed within one year "unless a longer period of time is provided by applicable statute."[45] The court stated that "the language 'unless a longer period of time is provided by applicable statute' is not ambiguous and was clearly intended to serve as a conformity clause that would waive or amend the one-year policy limitation provisions only when there was an express statute prohibiting the one-year contractual limitations."[46] *Graingrowers* is clearly distinguishable from our case because the policy in that case contained an explicit 12-month limitation provision.

Because the standard form's 12-month limitation applies when an insurance contract explicitly provides for it and the statute of limitations applies where there is no express provision, we must next decide whether the Port's alleged admission in its complaint is legally binding on it.

In its complaint, the Port stated that its policies incorporate the standard form fire insurance coverage. The Port asserts that this alleged admission does not mean that the standard policy suit limitation applies because it made the assertion under only one of its five claims for relief. Its second claim for relief was titled: "Declaration of coverage for measures taken to prevent increased hazards." Paragraph 55 of the complaint provided:

> Pursuant to RCW 48.18.120, every property insurance policy sold in the state of Washington must be accompanied by a standard form fire insurance policy commonly known as the "New York Standard Fire Insurance Policy" or the "165-line" fire insurance policy. Each insurance policy issued by each of the defendant insurers, as required by Washington law, was accompanied by the identical standard form fire insurance policy.

---

[45] *Graingrowers*, 711 F. Supp. at 1045.

[46] *Id.*

Nowhere else during the course of litigation, including the remainder of the complaint, has the Port stated that the standard policy is part of its policies. The Port asserts that

> [t]he Standard Fire Policy provision alleged in the Complaint dealt with reimbursing the insured for expenses incurred to prevent an increase in a hazard within the insured's control and knowledge. The Port's reliance on the "increase in hazard" provision of the Standard Fire Policy was an additional cause of action predicated on a provision not found in the Port's manuscript policy.[47]

CR 8(e)(2) permits inconsistent pleading. It provides in pertinent part:

> A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both.[48]

In *Molsbergen v. United States*, the Ninth Circuit stated that "[i]n light of the liberal policy embodied in [Federal] Rule [of Civil Procedure] 8(e)(2), we hold that a pleading should not be construed as an admission against another alternative or inconsistent pleading in the same case."[49] The Port pleaded five claims for relief in the alternative. This pleading technique is permissible under CR 8(e)(2), and, under that rule, the Port did not "admit" that a 12-month limitation period applied to its claims. The Port's suit was timely.

 Finally, the Port asserts that if we conclude that its suit was timely, the order dismissing the 1997 insurers

---

[47] (Citation omitted.)

[48] CR 8(e)(2).

[49] 757 F.2d 1016, 1019 (9th Cir.) (citing *Shipek v. United States*, 752 F.2d 1352, 1356 (9th Cir. 1985)), *cert. dismissed*, 473 U.S. 934 (1985).

should be reversed and remanded because the order is based solely on that ground. We disagree. Under RAP 2.5(a), "[a] party may present a ground for affirming a trial court decision which was not presented to the trial court if the record has been sufficiently developed to fairly consider the ground."[50] The record here is sufficient because, as counsel conceded at oral argument, the legal issues arising under the 1997 policies are the same as those we have decided here under the 1998 policies. We may therefore affirm both trial court orders on the same grounds.[51]

Affirmed.

Cox, A.C.J., and Appelwick, J., concur.

---

[50] *See also Caulfield v. Kitsap County*, 108 Wn. App. 242, 251, 29 P.3d 738 (2001) (citing *Nast v. Michels*, 107 Wn.2d 300, 308, 730 P.2d 54 (1986)).

[51] Because of our disposition of the other issues, we do not reach the question whether the known risk principle precludes the Port's claims under the policies.